# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *In re Dar. C.*, 2011 IL 111083

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* DAR. C. and DAS. C., Minors (The People of the State of Illinois, Appellee, v. Daryl Crockett, Appellant). |
| Docket No. | 111083 |
| Filed | October 27, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A termination of a father's parental rights by default in juvenile proceedings was vacated for lack of personal jurisdiction where he had been served only by publication and where the filing of a support action against him by a different assistant State's Attorney in the same prosecutor's office cast significant doubt on the diligence of the State's inquiry as to his whereabouts. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of McLean County, the Hon. Kevin P. Fitzgerald, Judge, presiding |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Adele M. Saaf, of Bloomington, for appellant.

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Mary E. Welsh, Assistant Attorney General, of Chicago, of counsel), for the People.

Diane L. Redleaf, Melissa L. Staas and Allegra Cira Fischer, of Chicago, for *amici curiae* Family Defense Center *et al.*

Justices

CHIEF JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justices Thomas, Garman, and Karmeier concurred in the judgment and opinion.

Justice Burke specially concurred, with opinion, joined by Justice Freeman.

Justice Theis specially concurred, with opinion.

## OPINION

¶ 1        This appeal asks us to determine whether the State performed a "diligent inquiry" to ascertain respondent's current and last known address, as required for service by publication under section 2-16(2) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-16(2) (West 2006)), and necessary for the trial court to obtain personal jurisdiction in this case. The circuit court of McLean County terminated respondent's parental rights to his two minor children, Dar. C. and Das. C. Respondent later filed a postjudgment motion for relief under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008)), arguing that the State failed to perform a diligent inquiry to ascertain his location when it served him notice by publication. Respondent therefore argued that the State's service by publication was ineffective to confer personal jurisdiction on the trial court.

¶ 2        The trial court denied respondent's petition, and the appellate court affirmed. No. 4-10-0267 (unpublished order under Supreme Court Rule 23). For the following reasons, we reverse the appellate court's judgment, vacate the trial court's order terminating respondent's parental rights, and remand for further proceedings.

¶ 3                              I. BACKGROUND

¶ 4        The complicated series of events underlying this case require us to detail extensively its development, focusing on the State's attempts to locate respondent. To provide context, we also summarize relevant background information.

¶ 5    On August 15, 2006, the Illinois Department of Children and Family Services received a hotline call reporting that Tonya Findley's four minor daughters were neglected and periodically left unsupervised. The reporter claimed that Findley was using drugs. Ultimately, the Department removed the children from Findley and placed them in temporary protective custody.

¶ 6    On September 7, 2006, McLean County Assistant State's Attorney Madeline McLauchlan filed a petition for adjudication of wardship. The petition identified respondent as the putative father of two of Findley's four daughters, Dar. C., born October 24, 1996, and Das. C., born May 13, 1998.[1] The petition alleged neglect against Findley but made no allegations against respondent. The petition listed respondent's address as Sheridan Correctional Center.

¶ 7    On September 8, 2006, the trial court held a shelter care hearing. The shelter care report, filed by Department investigator Shannon Stanfill, listed respondent's address as "Street address unknown, Chicago, Illinois." Following the hearing, the trial court entered an agreed temporary custody order.

¶ 8    On September 11, 2006, Assistant State's Attorney McLauchlan filed an affidavit for service by publication on respondent, averring that respondent could not be found within Illinois and could therefore not be served in person or by certified mail. McLauchlan further averred that respondent's address "cannot be ascertained upon diligent inquiry" and his last known address was "unknown."

¶ 9    On September 19, 2006, the clerk's office issued a notice of publication to respondent and "any known or unknown fathers" of the children. The notice was published the same day and provided, *inter alia*, that a juvenile court proceeding had commenced and a hearing would be held on October 24.

¶ 10   On October 11, 2006, the Department's Diligent Search Service Center issued a "certification of comprehensive diligent search." The certification indicated that a computer search of 14 databases had been performed. Although respondent's first name is spelled "Daryl," the search was conducted with his first name spelled as "Darryl." The computer search located one potential address in Peoria, Illinois. Two letters mailed to that address were returned.

¶ 11   On October 24, 2006, the trial court entered an adjudicatory order finding, in pertinent part, that it had personal jurisdiction over respondent through service by publication and that he had defaulted by failing to appear after service by publication. The court adjudicated the minors neglected based on Findley's admission of substance abuse.

¶ 12   On December 18, 2006, Department caseworker Nancy Murrah filed a service plan and dispositional report. The report indicated that respondent's location was unknown and a diligent search on October 11 revealed one possible address. The report stated that two letters mailed to that address were returned "attempted–not known." The report further stated that

---

[1]The parties agree that respondent is not the father of Findley's other two daughters. Accordingly, we do not detail the development of their cases.

the diligent search would be "periodically updated."

¶ 13   Following a hearing on December 20, 2006, the trial court entered a dispositional order finding that Findley and respondent were unfit parents. The order noted that respondent's "whereabouts [were] unknown." The court entered a permanency goal of returning the children home within 12 months, made them wards of the court, and gave custody to the Department's Guardianship Administrator with the right to place the children.

¶ 14   That same day, Murrah requested a second computerized diligent search from the Center. The search revealed a potential address of 11435 South Union Street in Chicago, Illinois. A letter addressed to respondent was mailed to that address, indicating that respondent was the potential missing parent of two children in the Department's custody in McLean County, Illinois. The letter provided Murrah's telephone number and requested further communication from respondent. The letter was not returned, but Murrah received no response from respondent.

¶ 15   In May 2007, Murrah filed a permanency report and service plan, indicating that Dar. C. and Das. C. had been placed in relative foster care and were adjusting very well. Respondent's address was listed as "unknown." Findley's progress was unsatisfactory because she continued to use illegal drugs and alcohol, was noncompliant with her prescribed medication, and lacked stable housing. Murrah recommended a permanency goal of return home within 12 months and a continued finding of parental unfitness. The Children's Foundation, a private social-services organization, was assuming responsibility of the minors' case.

¶ 16   On July 16, 2007, Jeannie Higdon, a caseworker at the Children's Foundation, filed a permanency report. Respondent's address was listed as "unknown." Higdon requested another diligent search on July 6, but did not have the results of her search when she completed her report. Higdon also asked Findley about respondent, but Findley denied knowledge of respondent's location or how respondent could be contacted. Higdon indicated that Dar. C. and Das. C. were moved to a new foster home after their original foster mother requested their removal. The minors were adjusting to their new foster home but were struggling with emotional and behavioral issues. Findley was making slow progress with addressing her substance abuse and obtaining stable housing. Higdon recommended a permanency goal of returning the minors home within 12 months and a continued finding of parental unfitness.

¶ 17   At a status hearing on July 31, 2007, Assistant State's Attorney McLauchlan informed the court that Findley's drug screen from June 2007 returned positive for cocaine. McLauchlan told the court that she believed there was no reason to continue the permanency goal of returning the children home, and explained that she would file a petition to terminate parental rights "unless there is something dramatic that convinces me to do something otherwise."

¶ 18   On September 27, 2007, Laura Seidelman, a social worker with the Children's Foundation, filed a service plan. Seidelman recommended that the permanency goal be changed to "substitute care pending court determination on termination of parental rights." Seidelman found that Findley's progress was unsatisfactory because she continued to use

alcohol, cocaine, and marijuana. Seidelman also filed a diligent search report for respondent and included the results of Higdon's search from July 2007. The searches revealed several potential addresses for respondent in Chicago, including 5018 Blackstone Avenue, apartment 302, 11422 Union Avenue, and 11435 Union Avenue. The search also located a potential address at 702 Sutton Court in Lake Villa, Illinois. Letters were sent to all of those addresses explaining the minors' situation and requesting a response. No response was received. The record does not indicate whether any letters were returned.

¶ 19       On October 17, 2007, Seidelman filed a permanency report. Seidelman reported, *inter alia*, that respondent made a telephone call to Findley during an October 10 supervised visitation with Dar. C. and Das. C. The girls reportedly "became very excited and seemed shocked" that respondent called. When Seidelman told Findley that respondent was required to report to the Department before contacting his daughters, Findley became agitated and swore at Seidelman. Findley's behavior upset her daughters, and Seidelman instructed Findley to end the visitation and telephone call. Seidelman did not speak to the individual on the telephone and could not confirm that it was respondent.

¶ 20       When asked, Findley denied knowing respondent's telephone number. Findley explained that respondent's sister had placed the telephone call and Findley did not know her telephone number. Findley told Seidelman that respondent was "a paranoid schizophrenic" and would not talk to Seidelman.

¶ 21       On October 19, 2007, Assistant State's Attorney McLauchlan filed a petition to terminate Findley and respondent's parental rights. The petition alleged that respondent had abandoned his two daughters, failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, and deserted the minors for more than three preceding months.

¶ 22       On October 31, 2007, the trial court held a permanency hearing. At the hearing, Assistant State's Attorney McLauchlan asked that the children's permanency goal be changed to substitute care pending determination of the termination petition, explaining that "[t]here is just really a whole lot of nothing going on as far as [Findley] is concerned." McLauchlan added that Findley was apparently able to contact respondent but chose not to provide them with any further information about respondent's location. After the hearing, the court changed the permanency goal to substitute care pending determination of parental rights and found that Findley and respondent remained unfit.

¶ 23       On November 2, 2007, Assistant State's Attorney McLauchlan filed an affidavit for service by publication for respondent on the termination petition, attesting that respondent could not be found within Illinois, his address could not be determined upon diligent inquiry, and his last known address was "unknown."

¶ 24       In the meantime, on November 6, 2007, another assistant State's Attorney from the McLean County State's Attorney's office filed a complaint in a separate action (No. 07-F-401 (McLean County)) seeking child support from respondent. The complaint noted that respondent had voluntarily acknowledged his paternity of Dar. C. under section 12 of the Vital Records Act (410 ILCS 535/12 (West 2006)). The complaint included a case detail report from the Illinois Department of Public Aid, listing respondent's date of birth, Social

Security number, and physical description. The report identified respondent's mailing address as 702 Sutton Court, Lake Villa, Illinois. Seidelman, the minors' caseworker in the termination case, signed and verified the complaint, dated October 9.

¶ 25 On November 8, 2007, a summons in the child support case was issued for respondent at the Lake Villa address, but the sheriff returned it unserved. The sheriff noted that an unidentified relative claimed that respondent did not live at the Lake Villa address. The unidentified relative was "uncooperative" and refused to provide the sheriff any other information about respondent.

¶ 26 On November 15, 2007, the court clerk published service to respondent on the petition to terminate his parental rights.

¶ 27 On December 7, 2007, Assistant State's Attorney Dean Engelbrecht, pursuing the child support case, mailed respondent a letter proposing a child support order, making Illinois Foster Care the obligee of dependent payments on behalf of the minors from respondent's Social Security disability income. The letter was addressed to respondent at an address in Grayslake, Illinois, in care of a Lake County health department treatment center. The letter referenced a December 5, 2007, telephone conversation between respondent, Assistant State's Attorney Engelbrecht, and respondent's unnamed caseworker.

¶ 28 On December 19, 2007, the trial court in the termination proceeding entered an order finding respondent defaulted by publication and unfit on all three grounds alleged in the petition. The court also scheduled a best interest hearing for March 2008.

¶ 29 On February 22, 2008, the trial court entered an order terminating Findley's parental rights after she executed a voluntary surrender of those rights.

¶ 30 On March 7, 2008, the trial court held a best interests hearing for respondent's two minor children. The State's only witness was Seidelman, who testified that respondent never came forward to claim paternity of the two minors. Seidelman performed a diligent search for respondent. Seidelman located a number of addresses for respondent and mailed letters to those addresses but never received a response from respondent. When the child support program provided Seidelman with a Lake Villa address for respondent, she mailed a letter to that address, but there was no response. The record does not indicate whether that letter was returned.

¶ 31 Seidelman explained that respondent received Social Security income, and the Department received some of that income for the children.[2] Seidelman reported that none of respondent's relatives had made any attempt to communicate with the minors. Seidelman recommended terminating respondent's parental rights to allow his daughters to be adopted.

¶ 32 After Seidelman recommended terminating respondent's parental rights, the court asked whether respondent was ever involved in the minors' lives. Seidelman explained that there was "some involvement" when the girls were younger but when Findley moved them to Bloomington respondent was no longer involved "other than occasional phone contact."

---

[2]There is no evidence in the record that Seidelman made any inquiry with the agency dispersing Findley and the minors' Social Security income to ascertain its source.

Seidelman stated that Dar. C., as the older child, retained some memory of respondent. According to Seidelman, Dar. C. claimed to talk occasionally to respondent on the telephone and was upset when Findley would not let Dar. C. talk to respondent at the supervised visit in October 2007.

¶ 33 Following Seidelman's testimony, Assistant State's Attorney McLauchlan argued that it was in the minors' best interests to terminate respondent's parental rights because respondent never came forward in the case and Findley had already surrendered her rights. McLauchlan noted that if respondent's rights were not terminated "these children will languish in foster case."

¶ 34 Brian Goldrick, the guardian *ad litem* for the minors, agreed, noting that the minors' case had been open for 18 months and respondent had never become involved. Goldrick argued that respondent is "probably aware that his children are in care, and he's done nothing to provide for these children over the last 18 months."

¶ 35 Following the hearing, the trial court commented that Seidelman properly conducted a diligent search and mailed letters to respondent's potential addresses. The court stated that respondent's failure to remain involved with the minors after they moved to Bloomington "probably" reflected respondent's lack of interest and also noted that respondent was absent for the entire 18-month custody period. The court then entered an order terminating respondent's parental rights. The court found that respondent was defaulted and found unfit at the December 19 hearing and that the best interests of Dar. C. and Das. C. required appointment of a guardian with the right to consent to adoption. The court also changed the minors' permanency goal to adoption.

¶ 36 In July 2008, Angela DeVore, Seidelman's supervisor, filed a permanency report. The report explained, *inter alia*, that the minors' foster parents preferred subsidized guardianship over adoption.

¶ 37 In August 2008, respondent filed a *pro se* motion seeking to vacate the trial court's order terminating his parental rights. Respondent asserted that he did not learn his parental rights had been terminated until July 2008 when he contacted the Department to request visitation with his daughters. Respondent stated that he was disabled and provided financial support to his two daughters through his Social Security disability income. Respondent denied that he was provided proper notice and argued that "he was disenfranchised and denied his due process right[s]" by the Department's service by publication. Respondent provided two mailing addresses, one in Park City, Illinois, and the second in Lake Villa, Illinois. The trial court struck respondent's *pro se* motion as untimely and not within the pleading requirements of section 2-1401 of the Code. The court also noted that respondent was never declared the minors' father and had not submitted himself to a paternity test.

¶ 38 In September 2008, respondent, through his attorney, filed a section 2-1401 motion seeking to vacate the trial court's termination order. Respondent argued that the Department's attempts to locate him in the underlying termination proceedings were not sufficiently diligent under section 2-16(2) of the Act. Respondent further asserted that the McLean County State's Attorney's office acquired his mailing address in the separate child support action before the trial court entered the termination order. Thus, respondent argued

that service by publication in the termination proceeding was improper because the State knew his actual location. Because service by publication was not permissible under those circumstances, the trial court lacked personal jurisdiction to enter the termination order.

¶ 39 At a hearing on respondent's motion, respondent testified that he was the father of Dar. C. and Das. C. Respondent lived with Findley when his daughters were born and shared a residence with them for four or five years. Respondent conceded that he had not seen his daughters for a few years but explained that it was difficult to visit them after Findley moved and he became ill. Respondent tried to maintain telephone contact with his daughters and sent them gifts and cards. Respondent also provided Findley with financial assistance. Respondent denied ever abusing or neglecting his daughters.

¶ 40 Respondent stated that he suffered from bipolar disorder and received Social Security disability benefits, with the Lake County health department treatment center acting as his payee. Respondent's daughters also received dependent benefits. Respondent lived at 3274 Seventh Street, apartment 3, in Park City, Illinois. Prior to living in Park City, respondent also lived with his sister, Stephanie, at 702 Sutton Court in Lake Villa, Illinois, and with his parents at 11435 Union Street in Chicago, Illinois. Respondent received mail at his sister's address and his parents' addresses, and they would forward his mail to him. Findley also knew how to contact respondent and his sister Stephanie. Respondent, however, denied receiving any correspondence from the Department concerning his daughters Dar. C. and Das. C. Respondent agreed to an entry of a formal child support order in McLean County after Assistant State's Attorney Engelbrecht contacted him. Respondent communicated with Engelbrecht by telephone and fax machine.

¶ 41 Respondent's sister Stephanie also testified and denied that she ever received any correspondence from the Department at her home at 702 Sutton Court in Lake Villa, Illinois. Stephanie explained that respondent received treatment from the Assertive Community Treatment team at the Lake County health department, including assistance with his medications and coordination of his Social Security benefits. Stephanie last saw respondent's daughters in 2005 when Findley brought them to her house for a visit with respondent. Stephanie testified that she and respondent loved his daughters and wanted a relationship with them. Stephanie did not know whether anyone in her household refused a summons for respondent in November 2007.

¶ 42 After hearing the testimony, the trial court dismissed respondent's section 2-1401 motion without prejudice. Respondent filed a direct appeal, but the appellate court dismissed his appeal for lack of jurisdiction because the trial court's order dismissing the complaint without prejudice was not final. *In re Dar. C.*, No. 4-08-0972 (2009) (unpublished order under Supreme Court Rule 23).

¶ 43 In January 2009, the trial court entered an order changing the minors' permanency goal from adoption to subsidized guardianship.

¶ 44 On May 12, 2009, respondent filed a second petition for relief under section 2-1401, asserting that service of process was ineffective on both the petition for adjudication of wardship and the petition for termination of parental rights. This pleading is the subject of this case.

¶ 45    In July 2009, the trial court held a hearing on respondent's second section 2-1401 petition. Assistant State's Attorney McLauchlan orally moved to dismiss respondent's petition, but the court declined to rule on the petition before respondent's paternity was established.

¶ 46    In August 2009, genetic testing was performed that established respondent's paternity of Dar. C. and Das. C.

¶ 47    In September 2009, the trial court entered an order approving private subsidized guardianship of the minors and discharging the Department as the minors' guardian.

¶ 48    In October 2009, the trial court held a hearing on respondent's second petition. Respondent's sister Stephanie testified that respondent lived with Findley and their daughters until he was diagnosed with a mental illness, specifically schizoaffective disorder. Following his diagnosis, respondent periodically lived with his parents or Stephanie. Respondent also spent some time at mental health facilities and hospitals. Stephanie became respondent's temporary guardian in 2003 to consent to his medical treatment. Stephanie explained that respondent suffered from an on-going illness and needed regular treatment and medication.

¶ 49    Stephanie testified that in October 2007 she arranged a conference telephone call between respondent and Findley. At that time, respondent was a patient at the Elgin State Mental Facility. Stephanie remained on the line and heard respondent briefly talk to Dar. C. and then heard Findley swearing. The telephone call soon ended. Stephanie did not have any additional contact with respondent's children after that incident. Stephanie denied that she ever received any information from the Department about the minors. After Stephanie's testimony, the court requested additional briefing and arguments on the Department's efforts to located respondent and scheduled a second hearing in February 2010.

¶ 50    At the February 2010 hearing, the State presented the testimony of four employees of the Department. Dawn Spencer, a Department court monitor and private agency monitor, testified that the federal government prohibited the Department's diligent search center from accessing federal Social Security records without a release from the individual being searched. Spencer also testified that the diligent search center did not search public aid records.

¶ 51    Shannon Stanfill, the initial Department investigator assigned to Findley's case, testified that he was informed that respondent lived in Chicago at an unknown address. Findley reported to Stanfill that Findley and one of her children received Social Security income based on their own respective "issues." Stanfill did not verify this information nor did he ask Findley to sign a release of Social Security information. Stanfill could not recall whether he asked Findley for respondent's telephone number or the names of respondent's relatives.

¶ 52    Joy Hershberger, a Department placement worker, testified that she worked with Findley in an earlier case involving the Department in 2005. During Hershberger's involvement in that case, Findley reported that respondent lived in Chicago. Findley also told Hershberger that she and Dar. C. received Social Security benefits but did not mention respondent's connection, if any, to the receipt of those benefits.

¶ 53    Nancy Murrah, the Department caseworker in Findley's case, testified that Findley reported that respondent lived in the Chicago area but Findley did not provide specific

information of his location. Murrah heard from someone involved in the case that Findley and respondent received Social Security benefits, but Findley herself did not offer the information. Murrah did not seek a release from Findley and did not attempt to verify the information about the Social Security benefits. Murrah requested two searches from the Center for respondent, received two potential addresses, and mailed letters to those addresses. Murrah did not receive a response to the letters.

¶ 54    Respondent presented the testimony of Angela DeVore, program manager at Children's Home and Aid. DeVore was assigned to Findley's case in November 2007, and supervised Laura Seidelman. DeVore acknowledged that Seidelman signed the complaint for child support in the minors' case and explained that Department caseworkers routinely signed requests for child support. DeVore further explained, however, that the Department of Health and Family Services (DHFS) assumed responsibility for all child support cases approximately three years ago. According to DeVore, when the Department has custody or guardianship of a minor, DHFS conducts all background work in child support actions and then sends the child support complaint to a Department caseworker for signature. DeVore had no knowledge of how DHFS obtained respondent's contact information in the child support action.

¶ 55    In March 2010, the trial court denied respondent's second section 2-1401 petition, finding that service by publication conferred personal jurisdiction over respondent for the petition for adjudication and the petition for termination because the Department conducted diligent searches. The court noted that Findley was the Department's only source of information about respondent and the Social Security benefits. Findley, however, failed to reveal any information about respondent. The court concluded that the child support action was a separate proceeding and the information obtained in that proceeding could not be attributed to the termination proceeding.

¶ 56    On appeal, the appellate court affirmed, finding that the first service by publication following a diligent inquiry on the petition for adjudication provided personal jurisdiction for the entire proceeding. No. 4-10-0267 (unpublished order under Supreme Court Rule 23).

¶ 57    This court allowed respondent's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)) and allowed the Family Defense Center to file a brief *amicus curiae* in support of respondent (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)).


¶ 58                                    II. ANALYSIS

¶ 59    On appeal, respondent argues that the State failed to perform the requisite "diligent inquiry" to ascertain his location. Specifically, respondent argues that the State's underlying service by publication under section 2-16(2) of the Act was ineffective to confer personal jurisdiction to the trial court when the State did not perform an adequate diligent inquiry and failed to locate him. Thus, respondent argues that the trial court's adjudication and termination orders were void for lack of personal jurisdiction.

¶ 60    We review *de novo* the legal question of whether a trial court obtained personal jurisdiction. *In re Detention of Hardin*, 238 Ill. 2d 33, 39 (2010). As this court has recognized, "[i]f a court lacks either subject matter jurisdiction over the matter or personal

jurisdiction over the parties, any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." *In re M.W.*, 232 Ill. 2d 408, 414 (2009); see also *Johnston v. City of Bloomington*, 77 Ill. 2d 108, 112 (1979) (when subject matter jurisdiction or personal jurisdiction is lacking "the proceedings are a nullity and no rights are created by them and they may be declared void when collaterally attacked"). When a trial court fails to obtain personal jurisdiction over a litigant, it is deprived of the authority or power to impose judgment against the litigant. *In re M.W.*, 232 Ill. 2d at 428.

¶ 61    Relevant to this appeal, personal jurisdiction may be imposed on a litigant by effective service of summons. *In re M.W.*, 232 Ill. 2d at 426. Providing effective service is a means of protecting an individual's right to due process by allowing for proper notification of interested individuals and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). Because the termination of parental rights implicates a fundamental liberty interest, the procedures employed must comply with due process. *In re M.H.*, 196 Ill. 2d 356, 363 (2001) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). Ultimately, inadequate service of summons or process divests the trial court of personal jurisdiction. *In re Antwan L.*, 368 Ill. App. 3d 1119, 1128 (2006).

¶ 62    Section 2-15 of the Act governs service of the summons of a petition alleging abuse, neglect, or dependency of a minor. 705 ILCS 405/2-15 (West 2006). The summons must include a copy of the petition and be addressed to the minor's legal guardian or custodian and to each named respondent in the petition. Personal service may be made by a county sheriff, coroner, or probation officer and must be made, in pertinent part, by either (1) delivering a copy of the summons and petition to the person being summoned or (2) delivering a copy to that person's usual place of abode and leaving it with a family member who is at least 10 years of age and then mailing a copy to the person being summoned. 705 ILCS 405/2-15(5) (West 2006). The return of the summons with endorsement of service by the officer is sufficient proof of service. 705 ILCS 405/2-15(4) (West 2006).

¶ 63    When personal service under section 2-15 cannot be accomplished, the Act provides two other mechanisms for service of summons. Section 2-16(1) allows for service by certified mail when personal service under section 2-15 is not made within a reasonable time or it appears that the respondent resides outside the state. 705 ILCS 405/2-16(1) (West 2006). The regular return receipt for certified mail is sufficient proof of service by certified mail. 705 ILCS 405/2-16(1) (West 2006).

¶ 64    As a last resort, section 2-16(2) allows for the final type of service authorized by the Act, service by publication. Section 2-16(2) requires, in pertinent part, that:

> "Where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. The Department of Children and Family Services shall adopt rules defining the requirements for conducting a diligent search to locate parents of minors in the custody of the Department. If, after diligent inquiry made at any time within the preceding 12 months, the usual place of abode cannot be reasonably ascertained, or if respondent is concealing his or her whereabouts to avoid service of process, petitioner's attorney shall file an affidavit at the office of the clerk of court in which the action is pending

-11-

showing that respondent on due inquiry cannot be found or is concealing his or her whereabouts so that process cannot be served. The affidavit shall state the last known address of the respondent. The affidavit shall also state what efforts were made to effectuate service." 705 ILCS 405/2-16(2) (West 2006).

Thus, section 2-16(2) contemplates a trial court obtaining personal jurisdiction through service by publication *only* when the State has conducted a diligent inquiry to ascertain the respondent's location and last known address.

¶ 65    Although section 2-16(2) does not define what constitutes a diligent inquiry or search, the standard is recognized to be "that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make." (Internal quotation marks omitted.) *In re Sheltanya S.*, 309 Ill. App. 3d 941, 956 (1999) (quoting *In re A.S.B.*, 293 Ill. App. 3d 836 (1997)). In turn, the term "diligent" means "characterized by steady, earnest, attentive, and energetic application and effort in a pursuit." Webster's Third New International Dictionary 633 (1993).

¶ 66    Here, the record demonstrates that respondent suffers from a mental illness, and that he moved periodically between his Illinois residence, his relatives' respective homes in Illinois, and treatment facilities in Illinois. The termination proceedings, initiated in McLean County in September 2006, lasted for 18 months, culminating with the March 2008 order terminating respondent's parental rights. During this time, the Department and the State consistently maintained that respondent could not be located in Illinois. In a separate child support action in McLean County, however, the State successfully located respondent at a treatment center in Lake County, Illinois, in December 2007, and obtained respondent's consent to entry of a child support order using funds from his Social Security disability benefits.

¶ 67    Focusing on the termination proceedings in this case, the efforts of the Department and the State to locate respondent consisted primarily, if not entirely, of entering respondent's name into various computer databases and then mailing letters to potential address matches, and asking Findley about respondent's location. The petition for adjudication of wardship, filed September 7, 2006, identified respondent as the father of two of Findley's two minor children and listed his address, albeit incorrectly, as Sheridan Correctional Center.

¶ 68    The State's affidavit for service by publication on the adjudication petition, filed September 11, 2006, attested that respondent could not be located in Illinois after diligent inquiry and therefore could not be served in person or by certified mail. The affidavit listed respondent's last known address as "unknown." The affidavit does not indicate what steps, if any, were taken by the State to locate respondent. The service by publication was issued on September 19, 2006.

¶ 69    In October 2006, a month *after* the State's initial affidavit for service by publication was filed, the Department's Diligent Search Service Center issued a "certificate of comprehensive diligent search," indicating that respondent's name had been entered into 14 address databases. This initial computer search, however, was conducted with respondent's first name misspelled as "Darryl," rather that its correct spelling as "Daryl." It revealed a potential address in Peoria, Illinois, and a letter was mailed to that address but no response was received.

¶ 70 Subsequent computerized searches of respondent's name, using his properly spelled first name, produced a potential match at 702 Sutton Court in Lake Villa, Illinois, his sister's residence. The searches also produced potential matches at various addresses in Chicago, Illinois, including his parents' address and his own former addresses. The Department mailed letters to those addresses, but received no response. There is no evidence in the record that the State or the Department sent anyone to those addresses to inquire about respondent's location.

¶ 71 Shannon Stanfill, the Department caseworker initially assigned to the minors' case, was informed that respondent lived in the Chicago area. Findley told Stanfill that she and her child received Social Security income, but Stanfill did not verify this information or ask Findley to sign a release of Social Security information. Stanfill could not remember asking Findley for respondent's telephone number or the names of respondent's relatives.

¶ 72 Nancy Murrah, another Department caseworker, was also told that respondent lived in the Chicago area and that Findley was receiving Social Security benefits. Murrah, however, did not verify receipt of those benefits or request a release of information from Findley. Joy Hershberger, a Department placement worker who worked with Findley in a previous case, testified that Findley told her that respondent lived in the Chicago area. Findley also stated that she and Dar. C. received Social Security benefits.

¶ 73 In October 2007, Laura Seidelman, the minors' caseworker from the Children's Foundation, was present during a supervised visit between Findley and the minors when respondent called Findley. When Seidelman instructed Findley to tell respondent that he was required to contact the Department before talking to his daughters, Findley became angry and ended the call. Seidelman could not verify respondent was on the telephone and Findley denied knowing respondent's contact information. Seidelman also signed the complaint for child support in the separate action. Seidelman's supervisor, Angela Devore, did not know how the State located respondent's contact information in the child support action. Ultimately, the Department and the State were unable to locate or contact respondent in the termination proceedings.

¶ 74 Consequently, when the State filed its affidavit for service of publication on the termination petition on November 2, 2007, it attested that respondent could not be located in Illinois after diligent inquiry. The affidavit listed respondent's last known address as "unknown." The service by publication was issued on November 15, 2007.

¶ 75 After carefully reviewing this record, we cannot conclude that the State and the Department performed the type of search or investigation that an earnest and attentive person seeking to learn a fact would ordinarily make, namely, the diligent inquiry required by section 2-16(2). Notably, the State and the Department failed to conduct *any* search or investigation into a number of opportunities to acquire respondent's contact information. See 705 ILCS 405/2-16(2) (West 2006) (providing that "[w]here a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address").

¶ 76 The Department was aware that respondent lived in the Chicago area, but its employees did not visit or inquire at any of the potential address matches in the area, including those

that eventually proved to be respondent's sister's residence in Lake Villa and his parents' residence in Chicago. Stanfill, the initial caseworker assigned to the case, could not recall if he asked Findley for respondent's contact telephone number or the names of respondent's relatives. Respondent's sister, however, denied receiving any contact from the Department about the minors' situation, and testified that she and respondent wanted a continued relationship with the minors. Thus, it is reasonable to presume that if a Department employee had talked to respondent's sister or his parents about the minors' situation, they would have provided some assistance.

¶ 77     The Department was also informed that Findley and the minors were receiving Social Security benefits, but no one made any attempt to verify Findley's source of income or request her to authorize a release of that information. Arguably, the failure to follow up on the Social Security information was a missed opportunity to learn if respondent was a source of that income and to acquire his contact information.

¶ 78     In other words, while the Department was aware that respondent reportedly lived in Chicago and the various computer searches produced a number of potential address matches in the Chicago area, the Department did not conduct any inquiry into those addresses. Instead, the Department simply mailed letters to those addresses. Similarly, although Department employees were aware that Findley claimed to be receiving Social Security benefits, the Department did not make any inquiry into this information. There is no explanation in the record why the Department chose not to pursue further inquiry into the potential address matches or the Social Security information.

¶ 79     Respondent also reportedly called Findley during a supervised visitation but no effort was made to obtain respondent's contact information during that incident. Likewise, although a caseworker was aware that respondent contacted Findley and Dar. C. by telephone there is no evidence in the record of any attempt to obtain respondent's telephone number.

¶ 80     In addition, the complaint in the separate child support action indicated that respondent had voluntarily acknowledged his paternity of Dar. C. under section 12 of the Vital Records Act (410 ILCS 535/12 (West 2006)). The complaint included a case detail report from the Illinois Department of Public Aid, listing respondent's date of birth, Social Security number, and physical description. It also identified respondent's mailing address as 702 Sutton Court, Lake Villa, Illinois. Seidelman, the minors' caseworker in the termination case, signed and verified the complaint, but otherwise conducted no followup on respondent's personal information contained in that report. Again, the record is silent on why the Department conducted no further inquiry.

¶ 81     In our view, the diligent inquiry of section 2-16(2) necessarily requires a good-faith attempt at acquiring the contact information of a parent whose whereabouts are unknown, including inquiry about potential leads on the parent's whereabouts. When, as here, the State and the Department possess information that reasonably could be relied on to discover a missing parent's location with further investigation, we believe that a diligent person intent on locating the parent would perform that investigation. Of course, when the only available information about a parent is his or her name, a computerized database search and letters might be sufficient to satisfy the diligent inquiry requirement in section 2-16(2).

¶ 82    In this case, however, the State and the Department possessed additional knowledge that may have led them to respondent's contact information. For example, the State and the Department possessed information that respondent lived in the Chicago area and had discovered multiple potential address matches in that area from the computer search. The Department knew that Findley and minors received Social Security benefits. The Department also knew that respondent placed a call to Findley during a supervised visit and had contacted Findley and his daughter by telephone on other occasions as well. It is reasonable to assume that a diligent inquiry into those matters would have likely resulted in the State acquiring respondent's contact information. In fact, the State's ability to obtain respondent's contact information in the separate child support action casts significant doubt on the diligence of the State's inquiry into respondent's location in the termination proceedings here.

¶ 83    Section 2-16(2) unequivocally requires a diligent inquiry in every instance when service by publication is used, regardless of whether that inquiry ultimately proves successful in locating the parent. 705 ILCS 405/2-16(2) (West 2006). Moreover, because service by publication is meant as a last resort of serving summons, it should be used only after a genuine diligent inquiry to locate the individual has been completed. Put simply, relying on a computerized database search of a parent's name while ignoring, or otherwise not investigating, other potentially useful information does not constitute a diligent inquiry under section 2-16(2).

¶ 84                                        III. CONCLUSION

¶ 85    We conclude that the State and the Department failed to perform the necessary diligent inquiry under section 2-16(2), the statute authoring service by publication in this case. Because the requisite diligent inquiry was not performed, the State's service by publication was defective and did not confer personal jurisdiction to the trial court, rendering its judgment void. *In re M.W.*, 232 Ill. 2d at 414; *In re Antwan L.*, 368 Ill. App. 3d at 1128. Accordingly, we reverse the appellate court's judgment, vacate the trial court's order terminating respondent's parental rights, and remand to the circuit court for further proceedings.

¶ 86    Reversed and remanded.

¶ 87    JUSTICE BURKE, specially concurring:

¶ 88    While I agree with the majority that the judgment terminating respondent's parental rights must be set aside, I write separately because I disagree with the reasoning used by the majority to reach that result.

¶ 89                                       I. Respondent's Claims

¶ 90    In March of 2008, the circuit court of McLean County entered a default judgment terminating the parental rights of the respondent, Daryl Crockett. Prior to the entry of the

judgment, respondent was twice served by publication–first in September of 2006, before the adjudication phase of the proceedings, and again in November 2007, before the termination phase.

¶ 91    In May of 2009, respondent filed a petition pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008)), seeking to have the default judgment set aside. In his petition, respondent alleged that both publication notices were invalid and that the circuit court lacked personal jurisdiction over him at the time it entered the default judgment. Thus, according to respondent, the judgment terminating his parental rights was void and should be set aside. The circuit court denied respondent's petition and the appellate court affirmed. No. 4-10-0267 (unpublished order under Supreme Court Rule 23).

¶ 92    Before this court, respondent repeats his claims that both of the publication notices were invalid. With respect to the September 2006 notice, respondent's primary contention is that the Department of Children and Family Services (Department) failed to conduct a diligent inquiry to locate him, as required under section 2-16(2) of the Juvenile Court Act (705 ILCS 405/2-16(2) (West 2006)), before serving him by publication. With respect to the November 2007 notice, respondent maintains that the Department and the McLean County State's Attorney had actual knowledge of his whereabouts and, for that reason, service by publication was improper.

¶ 93    The State, in response, initially contends that both of respondent's principal contentions regarding the publication notices are impermissible collateral attacks on the default judgment and, therefore, are not properly before this court. In so arguing, the State does not challenge the general rule which holds that a judgment entered by a court lacking personal jurisdiction is void *ab initio* and may be challenged at any time. See *In re M.W.*, 232 Ill. 2d 408, 414 (2009). Nor does the State dispute that respondent has alleged in his section 2-1401 petition that the circuit court lacked personal jurisdiction when the court entered the judgment terminating respondent's parental rights.

¶ 94    Instead, the State focuses on the nature of the proof that must be offered to establish that a judgment is void for lack of jurisdiction. Citing to *In re Custody of Ayala*, 344 Ill. App. 3d 574, 583-84 (2003), *In re Marriage of Stefiniw*, 253 Ill. App. 3d 196, 200-01 (1993), and *City of Rockford v. Lemar*, 157 Ill. App. 3d 350, 353-54 (1987), the State invokes a common law rule which recognizes that a judgment entered without jurisdiction is void and subject to collateral challenge at any time, but which holds that, in order to prove the judgment is void, the jurisdictional defect must appear on the face of the record. See generally 23A Ill. L. and Prac. *Judgments* § 158, at 15 (2008) ("Want of jurisdiction to enter the judgment ordinarily must appear on the face of the record to furnish a basis for collateral attack."); Restatement (Second) of Judgments § 77, cmt. a, at 224 (1982) ("It was a rule in common law courts that a judgment appearing to be valid on its face could not be shown to be invalid by proof contradicting the record of the action in which the judgment was rendered."); 47 Am. Jur. 2d *Judgments* § 760 (2006). Pursuant to this " 'absolute verity' " rule (*United States v. Bigford*, 365 F.3d 859, 867 (10th Cir. 2004)), if the jurisdictional defect does not appear on the face of the record, the judgment is not void and it may not be attacked at any time. Instead, according to the State, the judgment is merely voidable and it may only be attacked within the time limitations established by section 2-1401.

¶ 95    Applying this rule in the case at bar, the State contends that several of the arguments raised in respondent's petition, including both of respondent's principal contentions regarding the publication notices, do not rest "on the face of the record alone" but, instead, are dependent on evidence outside the record that was introduced in the hearings on respondent's section 2-1401 petition. Thus, the State maintains that respondent's contentions challenge "the judgment as voidable, rather than void," and those contentions are subject to the time limits established by section 2-1401. Further, the State asserts that respondent's section 2-1401 petition was not filed within the applicable statutory time limit imposed by section 2-1401. Therefore, according to the State, respondent's contentions are impermissible collateral attacks on the default judgment.

¶ 96    The majority does not address or acknowledge the State's argument that the jurisdictional defects alleged by respondent do not appear on the face of the record. Given the importance of the argument in defining the scope of the issues we must consider, I would address it. I would reject the argument because this court has held that the absolute verity rule is inapplicable where, as here, the moving party alleges that notice was never received and no third party has acted in reliance on the judgment:

> "If no rights of third parties have intervened, the defendant may have the judgment set aside even if the record shows affirmatively that he was served or that he appeared. (*Cassidy v. Automatic Time Stamp Co.*[,] 185 Ill. 431; *Kochman v. O'Neill*, 202 Ill. 110; *Hilt v. Heimberger*, 235 Ill. 235; *Owens v. Ramstead*, 22 Ill. 161.)" *Janove v. Bacon*, 6 Ill. 2d 245, 249 (1955).

See also *In re Estate of Young*, 414 Ill. 525, 535 (1953) ("The success of a collateral attack upon a judgment generally depends on a record showing lack of jurisdiction; [citations] an attack charging want of notice and opportunity to be heard, however, may be based on evidence *dehors* the record."). This exception to the absolute verity rule allowing the introduction of extrinsic evidence rests on the "inherent power of a court to examine its own records and to expunge a judgment if satisfied that the judgment was rendered without due notice to a party" (Restatement (Second) of Judgments § 77, cmt. a, at 224 (1982)), as well as the unfairness of forbidding a litigant from contesting a judgment for which he or she never received notice (see *Village of Algonquin v. Lowe*, 2011 IL App (2d) 100603, ¶ 24 (noting that it is problematic to apply the absolute verity rule when personal jurisdiction is at issue)).

¶ 97    Respondent's challenge to the order terminating his parental rights was brought in the same court which entered that order and no third-party reliance is at issue. In these circumstances, the absolute verity rule is inapplicable.[3] Accordingly, contrary to the State's

---

[3]The Restatement (Second) of Judgments rejects the absolute verity rule, stating that "the modern rule is that a judgment may be impeached by evidence that contradicts the record in the action" and that a litigant's reliance on such evidence is simply a relevant factor "in determining whether the forum is appropriate for hearing the attack." Restatement (Second) of Judgments § 77, cmts. a, b (1982). Because an exception to the absolute verity rule applies in this case, there is no need to consider the continuing viability of the absolute verity rule itself in Illinois.

assertions, all of the contentions raised in respondent's section 2-1401 petition are properly before us.

¶ 98                              II. Validity of the Services by Publication

¶ 99        When personal jurisdiction is obtained in a proceeding under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2006)), that jurisdiction continues until the matter is resolved. *In re M.W.*, 232 Ill. 2d at 428-29; *In re Abner P.*, 347 Ill. App. 3d 903, 908 (2004). Thus, when personal jurisdiction is obtained prior to adjudication, it is not necessary to reestablish that jurisdiction prior to termination. Relying on this rule, the appellate court below held that the September 2006 service by publication was valid and, therefore, there was no need to address the validity of the November 2007 publication notice:

> "We find the trial court obtained personal jurisdiction over respondent by publication prior to adjudication. Since service by publication was valid, the court acquired personal jurisdiction over respondent for the entire proceeding. *In re Abner P.*, 347 Ill. App. 3d 903, 908, 807 N.E.2d 1145, 1150 (2004). Thus, we need not address the issue of service by publication at the time of termination." No. 4-10-0267, slip op. at 14 (unpublished order under Supreme Court Rule 23).

¶ 100      Before this court, both respondent and the State recognize that respondent was twice served by publication and that the validity of the November 2007 notice will only be at issue if respondent can first establish the invalidity of the September 2006 notice. The majority, however, does not distinguish between the two publication notices. Instead, the majority conducts its analysis as if respondent was served only once and then, at the conclusion of its opinion, holds that this single service by publication was invalid because no diligent inquiry was conducted. *Supra* ¶ 85 ("Because the requisite diligent inquiry was not performed, the State's service by publication was defective and did not confer personal jurisdiction to the trial court, rendering its judgment void.").

¶ 101      In so holding, the majority relies on facts that have no relevance to the adequacy of the September 2006 notice. For example, the majority notes that a separate child support complaint was filed against respondent in McLean County while the termination action was proceeding. The majority concludes that the Department failed to follow up on personal information regarding respondent attached to the complaint and for this reason, as well as others, that the Department failed to conduct the required diligent inquiry. *Supra* ¶ 80. However, the child support complaint was not filed until November 6, 2007, over a year after the first publication notice was issued. Thus, the complaint can have no bearing on the validity of the diligent inquiry conducted prior to the issuance of the September 2006 notice.

¶ 102      The validity of the two publication notices should be addressed separately. Like the appellate court, I would first consider whether the September 2006 notice was valid and then, if necessary, consider the validity of the November 2007 notice.

¶ 103                        A. Validity of Service by Publication in September 2006

¶ 104      Section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008))

-18-

establishes a comprehensive statutory procedure for vacating a final judgment older than 30 days. See *People v. Vincent*, 226 Ill. 2d 1, 7 (2007). "Relief under section 2-1401 is predicated upon proof, by a preponderance of evidence, of a defense or claim that would have precluded entry of the judgment in the original action and diligence in both discovering the defense or claim and presenting the petition." *Id.* at 7-8 (citing *Smith v. Airoom, Inc.*, 114 Ill. 2d 209 (1986)). The State does not dispute that respondent's contention that the trial court lacked personal jurisdiction "substitutes for and negates the need to allege a meritorious defense and due diligence." *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 104 (2002).

¶ 105    Respondent maintains that the September 2006 service by publication was invalid because the Department failed to conduct a diligent inquiry prior to issuing that notice, as required under section 2-16(2) of the Juvenile Court Act. That provision states, in relevant part:

> "(2) Where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. The Department of Children and Family Services shall adopt rules defining the requirements for conducting a diligent search to locate parents of minors in the custody of the Department. If, after diligent inquiry made at any time within the preceding 12 months, the usual place of abode cannot be reasonably ascertained, or if respondent is concealing his or her whereabouts to avoid service of process, petitioner's attorney shall file an affidavit at the office of the clerk of court in which the action is pending showing that respondent on due inquiry cannot be found or is concealing his or her whereabouts so that process cannot be served. The affidavit shall state the last known address of the respondent. The affidavit shall also state what efforts were made to effectuate service. Within 3 days of receipt of the affidavit, the clerk shall issue publication service as provided below. The clerk shall also send a copy thereof by mail addressed to each respondent listed in the affidavit at his or her last known address. The clerk of the court as soon as possible shall cause publication to be made once in a newspaper of general circulation in the county where the action is pending." 705 ILCS 405/2-16(2) (West 2006).

¶ 106    The circuit court rejected respondent's contention after holding an evidentiary hearing. In this posture, the circuit court's judgment is reviewed to determine whether it is against the manifest weight of the evidence. See *S.I. Securities v. Powless*, 403 Ill. App. 3d 426, 440 (2010).[4] A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Cutright*, 233 Ill. 2d 474, 488 (2009).

¶ 107    The portion of the record relevant to the first publication notice establishes the following.

---

[4]The majority applies a *de novo* standard of review. *Supra* ¶ 60. *De novo* review would be appropriate if the circuit court had decided the issue without an evidentiary hearing. See, *e.g.*, *Commerce Trust Co. v. Air 1st Aviation Cos.*, 366 Ill. App. 3d 135, 140 (2006) ("Where, as here, the circuit court decided the issue of jurisdiction without an evidentiary hearing, we review the court's decision *de novo*.").

On September 7, 2006, a petition for adjudication of wardship was filed in the circuit court of McLean County which identified respondent as the father of two of Tonya Findley's four minor daughters. The petition incorrectly listed respondent's address as "Sheridan Correctional Center, Sheridan, IL."

¶ 108    Shannon Stanfill, the Department investigator initially assigned to the case, spoke to Findley about respondent. Findley told Stanfill that respondent lived in the Chicago area but that she did not know his address. Findley also gave Stanfill an incorrect date of birth for respondent. Stanfill made no other efforts to locate respondent. At the shelter care hearing, no evidence was presented regarding respondent, his location, or efforts made to find him.

¶ 109    On September 11, 2006, an affidavit in support of service by publication, which is required under section 2-16(2), was filed by McLean County Assistant State's Attorney Madeline McLauchlan. In the affidavit, McLauchlan attested that respondent's address could not "be ascertained upon diligent inquiry" and, thus, process could not be served upon him "either personally or by certified mail." The affidavit did not state what efforts had been made by the Department to locate respondent.

¶ 110    On September 19, 2006, the McLean County circuit clerk issued a "notice for publication" to respondent. The notice was published in the Bloomington Pantagraph the same day.

¶ 111    On October 11, 2006, a "Certification of Comprehensive Diligent Search" was issued by the Department's "Diligent Search Service Center." The certification indicated that a computer search had been conducted of 14 address databases for respondent's name.

¶ 112    On October 24, 2006, an adjudication hearing was held. At this hearing, the circuit court found that it had personal jurisdiction over respondent, through service by publication, and that respondent had defaulted by not appearing after being served.

¶ 113    Based on the foregoing, it appears that the only inquiry conducted by the Department prior to the issuance of the September 2006 publication notice was that of the investigator, Stanfill, asking Findley for respondent's address. Nothing in the record indicates that any attempts were made to pursue other readily available areas of inquiry prior to serving respondent by publication, such as asking Findley for respondent's telephone number, asking the minors and Findley for the names of respondent's relatives, or asking Findley whether she received support from respondent or had an existing child support case. Further, although the State stresses that the Department ran a computer search for respondent's address, that search was conducted a month after McLauchlan filed the affidavit in support of publication, and three weeks after the notice was actually published. The computer search thus fell outside section 2-16(2)'s requirement that the diligent inquiry be undertaken within the 12 months "preceding" the filing of the affidavit supporting publication. In addition, the computer search was run with respondent's first name misspelled as "Darryl," rather than "Daryl."

¶ 114    Under these facts, I would hold that the circuit court's finding that the Department conducted the diligent inquiry required before issuing publication notice under section 2-16(2) was against the manifest weight of the evidence. Accordingly, I would conclude that the September 2006 publication notice was issued in violation of section 2-16(2) and failed

to confer personal jurisdiction on the trial court. In light of this conclusion, I would also find that it is necessary to consider the validity of the November 2007 publication.

¶ 115                    B. Validity of Service by Publication in November 2007

¶ 116    Respondent acknowledges that he was served by publication a second time, after adjudication, in November of 2007, and that the Department made additional efforts to locate him prior to the issuance of that notice. Respondent does not contend that these efforts failed to satisfy the diligent inquiry requirement under section 2-16(2). Instead, respondent argues that the November 2007 service by publication was invalid because the McLean County State's Attorney and the Department had obtained actual knowledge of his location in a separate child support case that was being pursued at the same time as the termination action. Because section 2-16(2) permits publication notice only "[w]here a respondent's usual place of abode is not known" (705 ILCS 405/2-16(b) (West 2006)), respondent maintains that the November 2007 service by publication was invalid. The appellate court did not reach this issue since, as noted, the court concluded that the September 2006 notice was valid.

¶ 117    Despite the fact that respondent does not raise a diligent inquiry argument with respect to the second publication notice, the majority analyzes the validity of the notice solely on that basis. Because this is not the argument respondent is making, I would not address it. Further, even if it were appropriate to raise the diligent inquiry argument *sua sponte*, for the following reasons I cannot agree with the majority's conclusion that the Department failed to conduct such an inquiry with respect to the November 2007 notice.

¶ 118    After the adjudication hearing, the Department ran two additional computer searches for respondent–one in December of 2006 and one in July of 2007. The first search returned a possible address on Union Street in Chicago, which respondent later identified as his parents' home. Nancy Murrah, a Department caseworker, sent a letter to that address but no response was received.

¶ 119    The second search returned, in addition to the address on Union Street, an address on Blackstone Street in Chicago, which respondent later identified as a former residence, and an address in Lake Villa, Illinois, which was later identified as the home of respondent's sister. Letters were sent to each of these addresses, but no response was received. Laura Seidelman, a social worker, filed a "Diligent Search" report with the circuit court in September of 2007 which included the results of the second search.

¶ 120    The majority concludes that these efforts did not satisfy the diligent inquiry requirement of section 2-16(2). According to the majority, there were at least four additional steps that the Department could have undertaken to locate respondent and because the Department failed to take these steps, the inquiry was deficient. However, each of the proposed actions identified by the majority is problematic.

¶ 121    First, the majority states that "[t]he Department was aware that respondent lived in the Chicago area, but its employees did not visit or inquire at any of the potential address matches in the area." *Supra* ¶ 76. The majority cites no authority for the proposition that the Department is required, under section 2-16(2), to physically visit the potential addresses it uncovers in order to successfully perform a diligent inquiry. In my view, this requirement is

-21-

unduly burdensome and I disagree with its imposition here.

¶ 122　　Second, the majority states that the Department was also "informed that Findley and the minors were receiving Social Security benefits, but no one made any attempt to verify Findley's source of income or request her to authorize a release of that information. Arguably, the failure to follow up on the Social Security information was a missed opportunity to learn if respondent was a source of that income and to acquire his contact information." *Supra* ¶ 77. According to the majority, "[t]here is no explanation in the record why the Department chose not to pursue further inquiry into" this information. *Supra* ¶ 78. I disagree.

¶ 123　　The circuit court addressed the issue of Social Security benefits in its ruling denying respondent's section 2-1401 petition, stating:

> "There was an issue with respect to the children receiving Social Security benefits through [respondent] and whether or not there was a diligent effort made to pursue that information. The evidence that the Court heard was uncontradicted that the mother said she was getting Social Security benefits for the kids, but there was no indication from any of the caseworkers involved that the children were receiving benefits from the father. And even if there had been, the evidence was that the Department would not have been able to access that information without a release [from respondent], would not have been able to garner any information regarding his whereabouts without that release."

As the State points out, Findley told the Department's investigator, Stanfill, that she had bipolar disorder and that she and one of her children received Social Security benefits. Thus, there was no reason for Stanfill to ask Findley whether she was receiving dependent benefits through respondent. I disagree, therefore, with the majority's conclusion that the Department was required to investigate Findley's Social Security benefits.

¶ 124　　Third, the majority states that respondent "called Findley during a supervised visitation but no effort was made to obtain respondent's contact information during that incident" or thereafter. *Supra* ¶ 79. However, according to a permanency report prepared by Seidelman, who was present during the call, Findley denied knowing where respondent was or how to reach him and stated that she did not have a telephone number for respondent or his sister, the person who had actually placed the call on respondent's behalf. Further, Assistant State's Attorney McLauchlan testified at a permanency hearing held on October 31, 2007, that Findley was apparently able to contact respondent but that she chose "not to reveal any further information about him." Thus, the majority's assertion that the Department made no further inquiries of Findley regarding respondent's location is incorrect. The Department did make efforts to contact respondent through Findley, but Findley refused to cooperate.

¶ 125　　Finally, the majority concludes that the Department could have taken further action based on the separate child support action that was filed against respondent. The majority states:

> "In addition, the complaint in the separate child support action indicated that respondent had voluntarily acknowledged his paternity of Dar. C. under section 12 of the Vital Records Act (410 ILCS 535/12 (West 2006)). The complaint included a case detail report from the Illinois Department of Public Aid, listing respondent's

date of birth, Social Security number, and physical description. It also identified respondent's mailing address as 702 Sutton Court, Lake Villa, Illinois. Seidelman, the minors' caseworker in the termination case, signed and verified the complaint, but otherwise conducted no followup on respondent's personal information contained in that report. Again, the record is silent on why the Department conducted no further inquiry." *Supra* ¶ 80.

¶ 126    I disagree with the majority's conclusion that the child support complaint is relevant to the issue of whether a diligent inquiry was conducted. The complaint in the support action was not filed until November 6, 2007, four days after the affidavit for service by publication in the termination case had been filed. There is no basis in section 2-16(2) for requiring further diligent inquiry on the part of the Department after the affidavit has been filed.[5] *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997) ("We know of no precedent that would require the State to conduct a second diligent inquiry after it had completed its initial diligent inquiry pursuant to the Act.").

¶ 127    Further, as the majority itself notes earlier in its opinion, at some point, "the child support program provided Seidelman with a Lake Villa address for respondent, she mailed a letter to that address, but there was no response." *Supra* ¶ 30.[6] Thus, contrary to the majority's statement, the Department did follow up on the personal information attached to the child support complaint.

¶ 128    In light of the foregoing, I disagree with the majority's conclusion that the Department failed to conduct a diligent inquiry prior to serving respondent by publication in November of 2007. However, for the reasons set forth below, I agree that the judgment terminating respondent's parental rights must be set aside.

¶ 129    On November 2, 2007, Assistant State's Attorney McLauchlan filed the affidavit in support of the second service by publication in the termination case. The affidavit stated that respondent's address was unknown.

¶ 130    Four days later, on November 6, 2007, an unidentified McLean County assistant State's Attorney filed a complaint for child support against respondent in a separate action in the circuit court of McLean County. As noted, attached to the complaint was the case detail report which listed respondent's mailing address as his sister's home in Lake Villa, Illinois.

---

[5]With respect to the September 2006 notice, the majority is properly critical of the State for relying on a computer search conducted by the Department after the affidavit in support of publication had been filed. *Supra* ¶ 69. Yet, with respect to the November 2007 notice, the majority relies on the complaint for child support which, as noted above, was filed after the affidavit for publication was filed.

[6]Seidelman signed and verified the complaint in the child support action on October 9, 2007. The "case detail report" from the Department of Public Aid, the document which contained respondent's personal information and which was attached to the complaint, was dated October 29, 2007. The case detail report was thus attached to the child support complaint, presumably by the assistant State's Attorney, after the complaint was signed by Seidelman. It is not clear, therefore, when Seidelman became aware that the Villa Park address had been used in the child support action.

-23-

¶ 131     On November 15, 2007, notice to respondent of the petition to terminate parental rights was published.

¶ 132     On December 7, 2007, Assistant State's Attorney Dean Engelbrecht sent a letter to respondent in care of a Lake County health department treatment center located in Grayslake, Illinois. The letter referenced a telephone conversation, held on December 5, 2007, between respondent, his caseworker and Engelbrecht, and stated that an agreed support order was enclosed. The letter asked respondent to sign the agreed support order and return it to Engelbrecht for entry by the circuit court. The record does not indicate how Engelbrecht acquired the Grayslake address.

¶ 133     On December 19, 2007, the circuit court entered an order in the termination case finding that respondent was in default and that he was unfit on the grounds alleged in the termination petition.

¶ 134     On January 3, 2008, the circuit court in the support action entered the agreed child support order. The order was served on respondent at the Grayslake address.

¶ 135     On March 7, 2008, three months after Englebrecht had contacted respondent, the circuit court entered a final judgment terminating respondent's parental rights.

¶ 136     Based on these facts, respondent contends that the November 2007 service by publication was invalid because the McLean County State's Attorney not only knew where respondent was located, but had, in fact, communicated with him three months prior to entry of the judgment terminating his parental rights.

¶ 137     The State maintains, however, that once the affidavit was filed on November 2, 2007, and the publication notice issued, neither the Department nor the State's Attorney had any further obligation to investigate under section 2-16(2), "regardless of what anyone may have learned thereafter." I agree with the State that the obligation to conduct a diligent inquiry ended with the filing of the affidavit. But that is not the question before us.

¶ 138     The question here is whether service by publication will be considered valid and sufficient to confer personal jurisdiction on the circuit court under section 2-16(2) where, after notice is published, but several months prior to the entry of a default judgment terminating parental rights, the prosecuting State's Attorney is in actual contact with the parent. I believe the answer to this question is "no."

¶ 139     Section 2-16(2) provides that service by publication is only permissible "[w]here a respondent's usual place of abode is not known." 705 ILCS 405/2-16(2) (West 2008). Further, the interest at stake here, the termination of parental rights, is quite high and constructive notice is, as a general rule, disfavored. A reviewing court may presume that the legislature did not intend absurd, inconvenient, or unjust consequences. *People v. Marshall*, 242 Ill. 2d 285, 293 (2011). The General Assembly could not, in my view, have intended that publication notice stand as sufficient in these circumstances. Accordingly, I would hold that where, as here, the prosecuting State's Attorney is in actual contact with a parent several months prior to the entry of a default judgment terminating parental rights, a previously issued publication notice is insufficient, under section 2-16(2), to confer personal jurisdiction on the circuit court.

¶ 140     The State maintains, however, that even if Engelbrecht was in actual contact with

respondent, he was not the assistant State's Attorney of record in the termination proceeding and, therefore, the McLean County State's Attorney cannot be charged with knowledge of respondent's location in that action. I disagree.

¶ 141    There is no dispute that the McLean County State's Attorney was the prosecuting officer of both the termination proceeding and the child support action. There is also no dispute that Engelbrecht and McLauchlan, the assistant State's Attorney responsible for the termination proceeding, were agents of the McLean County State's Attorney. The "general rule is that a principal is affected with knowledge of all material facts of which his or her agent receives notice or acquires knowledge while acting in the course of the agent's employment and within the scope of his or her authority." 1 Ill. L. and Prac. *Agency* § 54, at 556 (2010). As the Restatement explains:

> "Imputation charges a principal with the legal consequences of having notice of a material fact, whether or not such fact would be useful and welcome. If an agent has actual knowledge of a fact, the principal is charged with the legal consequences of having actual knowledge of the fact." Restatement (Third) of Agency § 5.03, cmt. b, at 361 (2006).

The State offers no argument as to why the rules of agency law should be inapplicable here. Accordingly, under these facts, I would hold that the November 2007 publication notice was invalid and failed to confer personal jurisdiction on the trial court.

¶ 142    For these reasons, I agree that the order terminating respondent's parental rights must be set aside.


¶ 143    JUSTICE FREEMAN joins in this special concurrence.


¶ 144    JUSTICE THEIS, specially concurring:

¶ 145    I concur in the result reached by the majority and agree that the September 2006 publication notice was invalid because the Illinois Department of Children and Family Services (Department) failed to conduct a diligent inquiry before that notice was issued as required under section 2-16(2) of the Juvenile Court Act (Act) (705 ILCS 405/2-16(2) (West 2006)). I write separately because I disagree with the majority's treatment of respondent's argument concerning the second publication notice that was issued in November 2007.

¶ 146    The majority concludes that because the State and the Department failed to perform the requisite diligent inquiry under section 2-16(2), the State's attempts at service by publication were defective and did not confer personal jurisdiction on the trial court. Respondent does not contend, however, that the additional efforts made to locate him prior to the issuance of the second publication notice in November 2007 failed to satisfy the diligent inquiry requirement under the Act. Instead, he contends that the publication notice issued prior to the termination proceeding was not valid because the Department had knowledge of his address before the notice was published on November 15, 2007. Consequently, respondent argues that the publication notice was invalid because section 2-16(2) does not authorize service by publication where a respondent's address is known. I agree.

¶ 147     As the majority recognizes, when personal service under section 2-15 (705 ILCS 405/2-15 (West 2006)) cannot be accomplished, the Act provides for two other mechanisms for service of summons. Section 2-16(1) allows for service by certified mail when personal service under section 2-15 is not made within a reasonable time or it appears that the respondent resides outside of the state. 705 ILCS 405/2-16(1) (West 2006). Section 2-16(2) allows, as a last resort, for service by publication. 705 ILCS 405/2-16(2) (West 2006). Specifically, section 2-16(2) authorizes service by publication, in pertinent part, when the following requirements are met:

> "Where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. *** If, after diligent inquiry made at any time within the preceding 12 months, the usual place of abode cannot be reasonably ascertained, or if respondent is concealing his or her whereabouts to avoid service of process, petitioner's attorney shall file an affidavit at the office of the clerk of court in which the action is pending showing that respondent on due inquiry cannot be found or is concealing his or her whereabouts so that process cannot be served. The affidavit shall state the last known address of the respondent. The affidavit shall also state what efforts were made to effectuate service." 705 ILCS 405/2-16(2) (West 2006).

If the notice of the termination proceeding that was published on November 15, 2007, was valid under section 2-16(2), the trial court would have acquired personal jurisdiction over respondent for the entire termination proceeding. See *In re M.W.*, 232 Ill. 2d 408, 429 (2009) (once personal jurisdiction over a parent is obtained, that jurisdiction continues until the matter is resolved).

¶ 148     In this case, McLean County Assistant State's Attorney Madeline McLauchlan filed the affidavit for service by publication regarding the petition to terminate parental rights on November 2, 2007, which stated that respondent's address was unknown. On November 6, 2007, an unnamed McLean County assistant State's Attorney filed the complaint against respondent in the separate child support action. The complaint included the case detail report from the Illinois Department of Public Aid, dated October 29, 2007, which identified respondent's mailing address in Lake Villa, Illinois. The obligee in the child support action was "Illinois-Foster Care, DCFS." The minor's caseworker in the termination case, Laura Seidelman, had also signed and verified the complaint, dated October 9, 2007, in the child support matter. On November 8, 2007, the summons in the child support case was issued for respondent at the address in Lake Villa. On November 15, 2007, notice to respondent of the petition to terminate parental rights was published. On November 19, 2007, four days after the notice to respondent was published in this case, the sheriff attempted service of the issued summons in the child support case at the Lake Villa address, but returned it as unserved. The sheriff wrote on the summons that an unidentified relative claimed that respondent did not live there and did not provide any additional information about respondent.

¶ 149     In my view, the McLean County State's Attorney's office and the Department could not represent in the child support action that it had knowledge of respondent's address, but in this action serve him by publication. Although the attempt at service in the child support action was ultimately unsuccessful, it was not returned as unserved until *four days after* publication

notice in the instant case. Section 2-16(2) of the Act does not authorize service by publication where 1a respondent's address is known. While I recognize that section 2-16(2) is silent as to what occurs when the State and the Department acquire knowledge of a respondent's address subsequent to the filing of the affidavit, I decline to read into the statute that they may simply disregard knowledge of a respondent's address that may be discovered prior to the date that notice of a proceeding is published. See, *e.g.*, *In re D.D.*, 196 Ill. 2d 405, 418-19 (2001) (the cardinal rule of statutory interpretation is to give effect to the intent of the legislature, while presuming the legislature did not intend to create absurdity, inconvenience, or injustice); see also *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997) (the State's responsibility under section 2-16(2) was complete after it conducted a diligent inquiry in search of the minor's father, memorialized that inquiry in an affidavit, requested notice by publication, and *published* that notice in the local paper). Consequently, under the unique circumstances in this case, I would find that because the State and the Department represented that they had knowledge of respondent's address in the child support action prior to the publication notice on November 15, 2007, that notice was invalid and failed to confer personal jurisdiction on the trial court.

¶ 150    For these reasons, I concur with the result of the majority in reversing the appellate court's judgment; vacating the trial court's order terminating respondent's parental rights; and remanding for further proceedings.